Good morning, Your Honors. May it please the Court, Deanna Dotson on behalf of Appellant Ramiro Hernandez. The only evidence that the government had against Mr. Hernandez involved the recorded calls, the Perez recorded calls, and Agent Zelka's testimony regarding Villa Gomez's, what he allegedly said about the transactions during the drug transactions and also what was said as far as the threat goes on the confrontation. I'd like to start about the recorded calls. I went over this, I think, very thoroughly in the brief. However, I'd like to point out that if you look at the exhibits of the recorded calls, there is nothing for the call that, for the phone that was called for the 27th of July. That's exhibit 803. If you look at there, there are no calls on the 27th of July, and that is supposedly the phone number that was called. Also, if you look at the government's exhibit that places, it's their chart that has Hernandez at the very top with that same phone number, there is no evidence to show that that was Hernandez's phone at all. In fact, there was, there was during a hearing on the motion to suppress the wiretaps, they were talking about Hernandez, the phone of Hernandez that was wiretapped, and they called it the target telephone 1, but they didn't give a phone number. And so when the U.S. attorney was explaining this, the judge interrupted and said, well, was that Perez's? Was that the phone that Perez called? And the U.S. attorney said, no, and you find that on exhibits of record 1251. So there is no evidence of what, who this number belonged to, and it did not show that it belonged to Hernandez. And if you look at the other, the Perez phone, that was a seized phone. If you look at those phone records, there is a phone on the 27th at 1035 a.m., but that was from a number that ends in 1440. And if we go and look at, that number actually belongs to Hernandez, or Villa-Gomez. And if we go to exhibits of record 1256, the U.S. attorney is talking again about these wiretapped phones. They had wiretapped Mr. Villa-Gomez's phone the same time they wiretapped Mr. Hernandez's phone. In other words, they were trying to get evidence there of who was involved in this, this drug conspiracy. I have a question here. How did the agent's testimony regarding instructions given to Perez indicate that Perez himself, as opposed to an informant or another source, made incriminating statements about Hernandez? Are you talking about how Agent Jones and Agent Z testified, saying we're asking you, Perez, to call Hernandez and tell him that the drugs have been delivered? Indeed. Okay. There was no evidence supporting that, and that evidence presented to the jury that Hernandez, in fact, was a supplier, but there was no evidence of that. So those calls violated his confrontation clause, because Perez never testified in either trial. But they're not, at that point, they're not really admitted for the truth of the matter, because the, what Perez said isn't, the reason I thought it was not hearsay, and maybe you can disabuse me of this, is because they're not really for the truth of the matter. We're looking at a chain of events, and then what somebody says in response. But they're presenting it to the jury, and it's the same as in the Gomez case, it says, where they get up and say, our informant gave us this information about this supplier, and so they're presenting it to the jury. And those two quotes, by Jones and Z, were the only questions that the jury in the second trial asked, to have those testimonies re-read, about those calls. And so they clearly said, by their statements, they're saying, Hernandez was a supplier. So we're asking you to call him, because he was a supplier. And so that's giving the jury the impression that he was a supplier, but there was no evidence that he was a supplier. And Perez did not testify at all, in either trial, and he was not found unavailable. So those statements really violated Hernandez's opportunity to confront him and ask him questions about, because in those phones, in the C's Perez phone, Hernandez's name was not in the contact list at all. The agents determined, they looked at the contacts, there was no Hernandez name, so they made the determination, oh, we know he goes by the name of Boobs, B, so we're going to call the number under B. But Villa Gomez also goes by a name with starting B. He goes by a nickname of Bobby. That's a B also. And if you look back at the phone records from Perez's C's phone, look at the number of phone, that telephone calls between Perez and Villa Gomez. And the Villa Gomez number ends in 1440. And there are a number of calls there. And the last call was an inbound call from Villa Gomez to Perez, 1035 a.m. on the 27th of July. In the PSR, it stated that Perez picked up the car from the Mattson dock at 10 o'clock. So here Villa Gomez is calling him and probably asking him, did you get the car? We don't know, because there's no testimony. We have no idea what the testimony is. So therefore, this evidence was presented against Hernandez with not an opportunity to ask any questions of the people that were accusing him of and giving this information. So there's nothing in the calls. The expert, or not the expert, the custodian for the phone records for the Sprint Next Tell, he testified that there were no interactions between these two phone numbers, the one making the call and one supposedly receiving the call, whether it was a direct number or those, they called them the chirp numbers, the one with all the numbers. They said there was no interaction at all on the 27th. There were no calls between those two phones on the 27th. So my question is, that has been bothering me since I've had this case is, they're relying, are you going to ask a question, Donna? No, I'm just waiting. They're relying on these three recorded calls for the majority of their evidence that this is the evidence that shows Mr. Hernandez is guilty. He was a supplier. He gave the drugs. He's the one that supplied the drugs. The problem is, there's no evidence of that. There's no evidence to show that Mr. Hernandez had the drugs. There's no evidence to show that these phone calls were even made. And that's the problem I had, is if there's no evidence of these calls, then were these calls really made? Did you make that argument to the jury? Did the, I, I believe, I can't recall that, but I do believe the argument was made that these calls were not in the records. There was no evidence of these calls. It was brought up several times, particularly in cross-examination about these calls, that there's no evidence of these calls. What was put into the record? Was it a transcript? In the record, what? The appellate record? What is the evidence in the record with respect to the calls that you are objecting to? Well, there's evidence of the, the phone records is the evidence showing no calls. There's a testimony by the custodian records saying there are no calls on that date. And these, these call records were subpoenaed back for the first trial in 2010. So they had, and that was the same question. The first jury asked these same questions. That's why it was a hung jury, because there was no evidence. They asked, where's the evidence that Hernandez is on, on this phone? And the court said, well, if you can't find the evidence, then there is no evidence on there because there is no evidence showing that that's Hernandez' phone number, nothing. And so if you cannot support these calls, there was testimony about these calls, but no one could cross-examine Perez because he wasn't there to answer any questions. However, in, in the hearing where he was asked to come to, to see if he would testify, and he said he would not testify, but he threw his attorney, said, well, if I did get up and testify, I'd be, be saying exactly what I, I said before when I, you know, pled guilty. I would say it was not his voice on the phone, and it wasn't Hernandez that was involved in this. Of course, he didn't get up and testify, so that can't be used as evidence, but he would have said that, but there's nothing there. And if we go on to the confrontation clause with Villa Gomez, the only person that heard, the only person that heard the threat allegation was Agent Zelka. Agent Zelka had been investigating Villa Gomez way back. He, he's the first one that submitted the wiretap applications. In fact, it even showed during testimony that the wiretap applications were actually, he lied on those in the records where he did not submit the correct information about what he found in, in the wiretaps as far as evidence to, to extend these wiretaps. But in this threat, if we look at the testimony by the U.S. attorney during the December 6th hearing, he had just, the meeting was December 5th in California between the, the U.S. attorney flew to California. Villa Gomez did not show up. They got him on the telephone, and he said his car broke down. Well, why didn't somebody go get him? There were plenty of people there to go get him. Okay. But during, when he got back for the December 6th hearing, which was a motion to exclude these Villa Gomez's statements, the U.S. attorney said, well, we got him on the phone. This is at 10, access record 1093. We got him on the telephone, and we spoke to him. Mr. Villa Gomez indicated he was not going to sign the cooperation agreement with the district attorney's office, and he did not want to testify. But this wasn't the only time he said he wasn't going to testify. And then he said, he said, I sent an agent to go serve a subpoena on him, and he was served. And then Villa Gomez indicated to the agent that night, not before anybody else, but Villa, before Zelka, that he had been threatened by the defendant's office. So if this was such an important event, why didn't Villa Gomez mention it on the telephone? Oh, I'm not going to testify, because I'm afraid I was threatened. He didn't. Do you want to reserve remaining time? Oh, yes. Thank you, Your Honor. Good morning. May it please the Court, Mark N. Seong, assistant United States attorney for the United States. I would like to proceed in the order of the issues presented in the briefs, if that's permissible. The first issue, whether the district court erred when it found Defendant Hernandez caused Witness Villa Gomez not to be available, and thus allowed the hearsay statements of Mr. Villa Gomez into evidence, is reviewed by abuse of discretion, of course. That standard requires this Court to conduct a careful and searching inquiry into the facts, but this Court should not substitute its judgment for the tribunal below, in this case, the district court. This issue centers upon what's known as the forfeiture by wrongdoing exception to the hearsay rule. That's codified at Federal Rule of Evidence 804 B6. Hearsay becomes admissible in that case when, according to Giles v. California, the declarant is unavailable. The district court made that specific finding. It's at SCR 19 in the supplemental excerpts of records that there's a statement that's being offered against the party opponent, in this case, the defendant. Third, that the defendant caused or acquiesced in the witness becoming unavailable, and finally, that the defendant acted with the intent to prevent that person's testimony. Davis v. Washington found that after the Crawford case was decided, this does not violate Crawford and remains an equitable exception. Here, the district court, after two days of hearings, made a thorough, deliberate finding, finding and reaching reasonable, logical inferences based on the evidence presented to her. That evidence included testimony from DEA Special Agent Zelka, who testified about his conversations with Mr. Villagomez, the fear and concerns that Mr. Villagomez conveyed to him. He testified about his conversations and his observations of Mr. Villagomez's wife when he interviewed her in Indio, California, and her, I guess, drawing the ire of Mr. Villagomez when she was sharing more with the agent than he wanted her to. Mr. Villagomez testified, of course, which I'll touch on a bit more later. Mr. Villagomez's attorney in California testified and recounted all the different facts where Mr. Villagomez expressed his fear, where he didn't show up for the meeting as he was supposed to, relaying all of the various aspects of the threat. And then finally, the bouncer, or the bar employee at the bar where the altercation happened, who indicated that there was an altercation, a number of patrons were kicked out. Then in the parking lot of the bar, Mr. Villagomez was threatened, some individuals were armed, the defendant's sister referred to him as a snitch at that point. Now, the district court took all those things and coupled with, I believe, the district court gave great weight to Mr. Villagomez's answer. It was the defense attorney who asked the question as to why he was not testifying. And the quote was, why? Because I want to live. I have a family. You know, I'm married and I have four children. And that's an excerpt of record 729. The district court found those statements to be particularly genuine. The court also placed a great weight on the fact that Mr. Villagomez refused to testify, even if granted immunity, because that question came up. And the question was whether the government was going to grant an immunity. It became a non-issue because Mr. Villagomez flatly said, whether I get immunity or not, I'm not testifying in this matter. The burden of whether this forfeiture by wrongdoing occurred is preponderance of the evidence, the lowest burden of proof in the law. Clearly, based on all of the testimony that the district court heard, coupled with the demeanor of not only Mr. Villagomez, but you'll note that the district court also made a finding that the defendant repeatedly nodded his head when Mr. Villagomez was refusing to answer the questions to the district court, as if indicating that Villagomez was giving the correct response, meaning he wasn't going to testify. The Russell v. United States, which I cited, has one of my favorite quotes from any case. The trial judge can see in the conduct and demeanor of one who testifies, or even in the conduct and demeanor in the courtroom of defendants who have never taken the witness stand, as happened here, a thousand and one manners impossible for a reviewing court to glean from a printed page. The principle that a defendant's courtroom demeanor is evidence is well settled. So if you take all those things in their totality, it was clearly a correct and wise decision by the district court in concluding that the forfeiture by... Also, with respect to count two of the indictment, what evidence supports a reasonable inference that Hernandez aided in the March 2006 shipment? Your Honor, there was... That evidence first came to light from Mr. Perez when he was interviewed after he was arrested. The agents were able to corroborate that evidence by tracking down the actual storage facility in Hilo, Hawaii. They went to that storage facility, were able to search it. Inside the storage facility was basically the identical car as the one that the drugs had been seized from, which initiated this on July 26th. And the drive shaft was missing, which is exactly the same place where the drugs had been concealed in the later case. Now, the appellant kept saying, there's no evidence, there's no evidence, there's no evidence in this case. Exhibit 800 was the recorded phone calls. Those calls were played to the jury, and there were two witnesses who identified Hernandez's voice as being the recipient of the calls. And in those calls, there was conversation about, okay, wait until you get the 300,000 before you leave the car. I wanna know what's going on, keep me up to date, et cetera, et cetera. The people who identified, there were two witnesses who identified Mr. Hernandez's voice. One in particular, it was particularly compelling because it was a police officer from the Coachella Valley in California, who had previously arrested Mr. Hernandez. And he recalled Mr. Hernandez and remembered his voice because Mr. Hernandez had threatened him and basically told him he was a part of the Mexican mafia, and that was what resonated with the officer, and which is why he remembered him. The phone calls are obviously important, and it was important that they be to Hernandez, I take it, and that the government established that that was Hernandez. Correct. On the other side. Did Hernandez offer an expert saying it wasn't his voice? He did. Why was that rejected? Well, yeah, it was basically, this was a classic battle of the experts. The defense had one saying it was him. The government put forth a different one saying it was not a reliable conclusion, and expressed a number of different flaws in that conclusion. The jury obviously rejected that, and so they kind of washed each other out, and we were left with the actual voice on the calls. And as to that... So there was all of that evidence that Hernandez wanted to put in respect to whose voice it was came in? It was. Heard by the jury? Yes, yes, Your Honor. And on this issue of whether there was error for admitting those phone calls, as I stated in our brief, this matter, this exact issue, was decided in the co-defendant, Govea's appeal, and I believe it is law of the case in this case. The Govea court found that it was not testimonial, it was not offered for the truth of the matter, and so there was no error. And I think this court should follow that and be consistent on that point. In her argument this morning, your adversary made the point that there was no evidence that the number that was called by Perez was actually Hernandez's number. And your response would be? Your Honor, according to the phone records of the phone numbers we had, it does not appear. Now, are phone records perfect? Not all the time. Could there have been another phone that Mr. Hernandez was communicating with, with the other co-conspirators? Drug dealers have multiple phones, that's pretty clear. So are there phone records? No. But there's a phone call, we have the recording, and the recording was admitted into evidence and played for the jury. And your point would be it wouldn't matter whether it was established it was his number, if it was his voice? Yeah. I mean, whose phone it is, who the phone belongs to or subscribes to is irrelevant. We see all the time drug dealers subscribe in false names. It's who was on the phone at that time. While we're on the point of the no evidence argument by the defense, of course, there's the Dover Review, the standard for whether there was sufficient evidence. The evidence must be viewed in the light most favorable to the government. And in that light, the question then is, could any rational trier of fact convicted? And that's, of course, under Jackson v. Virginia. There were multiple aspects of evidence that all came together in this case. Of course, first of all, there was the drug seizure, significant drug seizure, with the corresponding twin vehicle that was tracked down from several years earlier. There was Perez phone calls, as we've talked about. There were the identifications by the two independent witnesses of Mr. Hernandez's voice. There were Mr. Villagomez's statements that came in under the forfeiture by wrongdoing. And there were also the prior threats that the court referenced that Mr. Villagomez and his family had made. That was part of the court's decision in the forfeiture by wrongdoing. So taking all of that evidence together, again, in the light most favorable to the government, it is clear that any rational trier of fact could have convicted under all those circumstances and with all that evidence and facts before it. Finally, I would like to address the last issue that was the government committed discovery and or Brady violations in this case. At no time, and it wasn't even mentioned today at all by the appellant, in any of the briefing, has the appellant ever identified or specified what was not disclosed. Never. Not once. It's just a simple blanket statement. There was discovery violations, and it was material, and it was prejudicial with nothing to back it up. So it was very difficult in this case to try and respond other than doing what I did and show the entire history of the case. And there were numerous instances where discovery motions were made by one attorney of all the attorneys that participated in this case in the two trials representing Mr. Hernandez. There was only one attorney that ever raised discovery violations, and that was the trial attorney for the second trial. But as you saw in my brief, there's at pages 34 to 37, the district court and even the magistrate court who heard some of these at no point ever found that the government was in violation or had failed to disclose anything in this matter. So until the defense and the appellant can show that, I think that issue is a moot point. And I would end by concluding that the appellant themselves even conceded at page 80 of their opening brief that there's nothing in the record that shows that or substantiates that. So for those reasons, unless the court has questions, we would ask that you affirm. Thank you. Well, I don't have a lot of time to answer all his, what he brought up. On the discovery, it's outlined in the brief from page 74, I don't know, on for several pages, exactly what some of the discovery violations were, and they're in the docket. They're fully explained in there. But that's not, the major thing is on this confrontation clause against Villa-Gomez, Giles stated that you had to show that, in other words, that Hernandez had the intent to keep Villa-Gomez away from testifying. There was no evidence that showed that intent at all. There were no phone calls. The government subpoenaed and asked for the Federal Detention Center to get all the, any communication out of the Federal Detention Center from Mr. Hernandez. And there was nothing. And when he said in his arguments before the ruling on the forfeiture, he said, we have not presented and we have no evidence of communications out of the FDC where the defendant was housed. Well, how? Mr. Hernandez was in Hawaii. His whole family, his sisters and everyone else was in California. How is he supposed to communicate with anyone and get the information out that Villa-Gomez is going to be, is going to testify against him? Okay, if we go through where the incident happened at Neal's Bar, there was a confrontation. There's no real evidence that it was Villa-Gomez that the witness Reyes was even talking about. Because he said, well, I remembered him because of the Hawaii ID. But only Villa-Gomez's California driver's license ID and his wife's ID were presented. There wasn't a photo spread for him to say, oh yeah, that was him. The same with the sisters. There was no time. When did this event happen? They were varying. The U.S. attorney gave varying dates. It was either in mid-October or it was in mid to end of November. There's no dates. Okay, so what evidence was corroborated that Zelka was giving about Villa-Gomez's alleged threat? If he had this confrontation in the bar and the sister did, it was there, and they alleged that she made a phone call, and then they were, they were asking if Villa-Gomez, supposedly if it was him, was escorted out. The guard that actually saw the confrontation in the bar didn't, wasn't asked to testify or asked any questions. He was the one that actually escorted him from outside the front door to the parking lot. If there had been all these men there with guns, he would have seen that. But he said no. He gave the signal he's off property. That was the rules for the bar. You had to tell him he was off property. So there was no corroboration. Zelka vaguely looked at, at the video. In fact, he, his testimony was conflicting because he gave different versions each time he testified. But there was no. You may want to sum up as you've exceeded your time. Oh, I'm sorry, Your Honor. There was no corroboration of anything that Zelka said that Villa-Gomez said about the threat. There was nothing showing that Hernandez intended to prevent him. There was nothing there. There was no evidence against Hernandez on anything. When you asked about aiding and abetting, that was with somebody else. Hernandez was, was never even mentioned in that charge. Never mentioned. No evidence was presented. There was no evidence presented except Villa-Gomez saying the drugs were dropped off at his house. Nothing else was said. No one else testified. Thank you, Your Honor. I thank both counsel for the argument this morning. The case of United States v. Hernandez is submitted.
judges: Schroeder, D.W. Nelson, McKeown